IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | 2:05-CR-0061 |
| | § | |
| DAVID VAZQUEZ-JOSE (01) | § | |
| MANUEL GOMEZ-LOPEZ (02), | § | |
| a/k/a Anibal Palacios-Hernandez | § | |

## REPORT AND RECOMMENDATION TO DENY
## DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE

On September 30, 2005, defendant DAVID VAZQUEZ-JOSE filed a motion to suppress evidence, specifically, evidence of illegal alien passengers in a van driven by defendant who were discovered after the van was stopped by a Border Patrol agent in Amarillo, Texas. By his motion, defendant alleges his Fourth Amendment right against unreasonable searches and seizures was violated by the stop because the specific articulable facts, together with rational inferences from those facts, did not reasonably warrant suspicion that the vehicle contained aliens who were illegally in the country. On October 7, 2005, the government filed its response in opposition to the motion. On October 13, 2005, co-defendant MANUEL GOMEZ-LOPEZ joined in the motion to suppress. The Court conducted an evidentiary hearing on the motion on October 13, 2005. The government and defendant VAZQUEZ-JOSE filed supplemental briefs on October 18, 2005.

### FACTUAL BACKGROUND

On September 6, 2005, at approximately 9:00 a.m., defendant VAZQUEZ-JOSE was driving a full-size Ford Econoline van eastbound on I-40. U.S. Border Patrol agent Randy

Betscher was sitting in a marked Border Patrol unit in the median of the interstate in Amarillo, Texas.[1]  As the van was approaching his position, Betscher observed that the van did not have a license plate affixed to the front of the vehicle.  As the van passed his patrol unit, Betscher observed two Hispanic-appearing males in the front seats of the van.  Betscher pulled his patrol unit onto the highway to follow the van.  As Betscher followed the van, he observed Florida license plates on the van and observed the van was traveling at a rate of speed below the posted speed limit.  Betscher radioed in the plate numbers and learned the van was registered to an individual with a hyphenated Hispanic last name.  When Betscher pulled his patrol unit alongside the van, he observed the driver, a younger Hispanic male, was wearing sunglasses even though it was an overcast morning.  The driver was also driving with a tight two-fisted grip, and never looked over toward Betscher's patrol unit.  Betscher also observed that the passenger was no longer visible and appeared to be slouched down low, possibly under a blanket.  Betscher reduced the speed of his patrol unit in order to travel parallel to the side windows of the van.  Betscher testified he was able to see through the windows of the van and observed the bucket or bench seats of the rear passenger area of the van had been removed.  He was also able to see two individuals were sitting on the floor of the van.  When Betscher dropped his patrol unit back behind the van, the passenger in the front seat raised back up to a sitting position.  Betscher testified that as he traveled behind the van, he concluded the van was heavily laden by observing how the van "bounced" as it traveled down the highway.  Betscher initiated a stop of the vehicle, discovering numerous individuals being transported inside the van who were later determined to be illegal aliens from Mexico.  Defendants were arrested and subsequently charged with "alien

---

[1] Counsel for defendants elicited testimony from a witness indicating a discrepancy in the mile marker entry in the agent's report.

smuggling." It was subsequently determined that defendant GOMEZ-LOPEZ owned the van under the name Anibal Palacios-Hernandez.

## POSITIONS OF THE PARTIES

An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. *United States v. Cortez*, 449 U.S. 411, 417 (1981). Consequently, except at the border and its functional equivalent, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). In determining whether a border patrol agent's stop of a vehicle was based on specific articulable facts, and rational inferences from those facts, sufficient to reasonably warrant suspicion that a vehicle contained illegal aliens, courts may consider: (1) the proximity of the area to the border; (2) the known characteristics of the area; (3) the usual traffic patterns on that road; (4) the agent's previous experience in detecting illegal activity; (5) information about recent illegal trafficking in aliens in the area; (6) particular aspects or characteristics of the vehicle; (7) behavior of the driver; and (8) the number, appearance, and behavior of the passengers. "No single factor is determinative; the totality of the particular circumstances must govern the reasonableness of any stop by roving border patrol officers." *United States v. Moreno-Chaparro*, 180 F.3d 629, 631-32 (5th Cir. 1998). Only those factors known to the officer at the time of the stop can be considered when determining whether the stop was reasonable. *Id.* at 632. "[I]n all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry[,] . . . smuggling," or other criminal activity. *Brignoni-Ponce*, 422 U.S. at 885. Here, defendants contend consideration of the above-cited factors demonstrate Agent

Betscher did not have a reasonable suspicion to support the stop, search and seizure of the van in which defendants were traveling.

At the October 13, 2005 hearing, Agent Betscher testified as a fact witness for the government.[2] At the hearing, Mr. Albert Flowers, testifying as an automotive expert for the defense, testified:

1. Based on the following facts, it was his opinion that the van would not have "bounced" as it traveled down the highway and would not have exemplified any characteristics indicating a heavy load:

    a. The van had fairly new air shocks installed in the rear, said shocks had air in the system, and such shocks, if working properly, would have decreased any "bouncing" of the van;[3]

    b. The section of road on which Betscher purportedly followed the van is a smooth road and would not have caused excessive "bouncing"; and

    c. With the seats removed and only ten (10) small statured men in the back, the van would not have appeared heavily loaded.

2. Based on his personal observations, evidenced by photos taken while standing next to the van, the side windows of the van were so darkly tinted that one would not have been able to view any occupants through the side windows.

The government argues the following specific articulable facts to which Agent Betscher testified, and all rational inferences therefrom, were sufficient to reasonably warrant Agent's Betscher's suspicion that the van contained illegal aliens:

1. Agent Betscher has extensive training and 17 years experience in observing and analyzing different types of vehicles, their traffic patterns as well as their characteristics, to determine if they are transporting illegal aliens;

---

[2] Agent Betscher's testimony is set forth below as part of the government's position on this motion to suppress.

[3] Agent Betscher testified that any air shocks installed on the van must not have been working properly because the van, when empty, was level instead of the back end being raised.

2.  Tucson, Arizona is the main destination of illegal aliens who have crossed the Arizona border on foot. The illegal aliens are then transported to Phoenix, Arizona, a known "warehousing" location for illegal aliens before they are dispersed to other areas in the United States;

3.  I-40 is the preferred route for smuggling illegal aliens from Phoenix, Arizona to the southern states and North and South Carolina;

4.  Betscher had previously been called multiple times to pickup numerous illegal aliens discovered during stops on I-40;

5.  Betscher was aware of the high numbers, even if not the exact numbers, of illegal aliens found being smuggled on I-40;

6.  The van was passing through Amarillo, Texas at approximately 9:00 a.m., which would be consistent with the van having left the Phoenix, Arizona area under the cover of nightfall;

7.  Aliens are most commonly smuggled in high occupancy vehicles such as the full-size van involved in this case;

8.  Vehicles smuggling aliens commonly have license plates from Arizona, North or South Carolina, or Florida;

9.  The van here at issue did not appear to be a local work vehicle because it was customized and did not bear Texas plates;

10. The van in which defendants were traveling bounced after hitting each small riser depression in the roadway, indicating it was heavily laden;

11. Through the side windows of the van, Agent Betscher was able to clearly observe that the rear seats of the van had been removed and was able to discern that two individuals were sitting on the floor behind the front passenger seat;

12. The van was registered to an individual with a hyphenated Hispanic surname;

13. The front seat passengers were young and of Hispanic appearance;

14. The driver's behavior was suspicious because he refused to look at the agent while the patrol vehicle was beside the van, he was driving below the speed limit, he was wearing sunglasses even though it was an overcast day, and he had a two-handed, tight-gripped hold on the steering wheel; and

15. The front passenger's behavior was suspicious because when the van passed the agent's vehicle in the median, Betscher observed a passenger in the front, but when he pulled abreast of the van, the passenger was not visible and appeared to be under a blanket, and only returned to a visible position when the agent's vehicle fell back to follow behind the van.

Defendants argue the following support a finding that there was no reasonable suspicion to support the stop:

1. The stop was not made in close proximity to the border, a paramount factor;

2. Other than Agent's Betscher's testimony, there is no evidence that I-40 is a favored route for illegal alien smugglers, and there is no evidence, considering the volume of traffic on I-40, to suggest that the probability that any particular vehicle would contain illegal aliens;

3. The time of day in which the van was passing through Amarillo, Texas, *i.e.*, approximately 9:00 a.m., was not a sufficient basis on which to raise suspicion that it was transporting illegal aliens, especially considering the fact that it was traveling during the work week, a time when, according to Agent Betscher, smugglers know the border patrol is working in Amarillo;

4. The presence of Florida license plates on a vehicle traveling through Amarillo, Texas did not present an inference of criminal conduct;

5. Agent Betscher had not received specific, reliable information about recent illegal trafficking in aliens in the area;

6. Based on expert witness testimony, the van in which defendants were traveling would not have bounced excessively or exemplified indications of being heavily laden;

7. Based on expert witness testimony, it would not have been possible for Agent Betscher to observe specific characteristics of the interior of the van through the heavily tinted glass of the side windows;

8. The van was legally registered and the fact that registration was to an individual with a hyphenated Hispanic surname did not present an inference of criminal conduct, especially considering that Florida has a large Hispanic population as well as a large immigrant population;

9. Similarly, the simple fact that the front seat passengers were of Hispanic appearance did not reasonably warrant suspicion that they were transporting illegal aliens;

10. Defendant VAZQUEZ-JOSE's failure to look over at the agent while his vehicle was beside the van was not suspicious behavior reasonably warranting suspicion that the vehicle contained illegal aliens;

11. Defendant VAZQUEZ-JOSE's driving the speed limit, or just below the speed limit, was not suspicious behavior reasonably warranting suspicion that the vehicle contained illegal aliens;

12. Defendant VAZQUEZ-JOSE's behavior of wearing sunglasses on a purportedly overcast day while driving eastbound in the morning was unremarkable and was not suspicious behavior reasonably warranting suspicion that the vehicle contained illegal aliens;

13. Defendant GOMEZ-LOPEZ's slouching or slumping in his front passenger seat under a blanket while the agent's vehicle was abreast of the van was not so unusual as to warrant suspicion, especially as there is no evidence that defendant was aware of the agent's presence, and defendant's return to a sitting position while the agent continued to follow behind the van dispelled any indication of an attempt to hide;

14. If Agent Betscher was able to discern, through the heavily tinted window, that two passengers were seated on the floor in the back of the van, such was not suspicious as they did not attempt to hide or react in any manner, and two is not a large number of passengers to have in the back of a van; and

15. Defendants did not have the disheveled appearance Agent Betscher described as typically characteristic of alien smugglers who are newly-arrived illegal aliens themselves.

Prior to discussing whether the above factors did or did not rise to the level necessary to justify the stop, there are two issues which impact on that determination and which warrant individual discussion, *i.e.*, the presence of illegal immigration activity on I-40 near Amarillo and

the credibility of Agent Betscher.

## ILLEGAL IMMIGRATION ACTIVITY

Evidence of illegal immigration activity on and along I-40 was presented by the government at the hearing. The government presented such evidence in the form of testimony from Agent Betscher that illegal aliens apprehended on I-40 in the Amarillo area over the past several years would result in either the aliens or the paperwork involving the aliens being processed through the Border Patrol Station in Lubbock where Agent Betscher is stationed. As a result, Agent Betscher was aware of a large number of illegal alien apprehensions occurring on I-40 in the proximity of Amarillo. Agent Betscher also testified he was personally involved in several apprehensions in the Amarillo area of I-40.

The government also offered statistical evidence in the form of what was described as "ENFORCE" reports of illegal alien activity in the Amarillo area for the months of August and September 2005 (Government's Exhibit 37). Government's Exhibit 37, along with Government's Exhibits 35 and 36, were admitted at the hearing for the purpose of showing Agent Betscher's knowledge of illegal alien activity in the Amarillo area, acquired as a result of processing the aliens or the paperwork associated with such aliens through Lubbock, was not unreasonable. Since Agent Betscher testified he had not examined these "ENFORCE" reports prior to the September 6, 2005 stop, such reports could not supplement his personal knowledge on September 6, 2005.

While the undersigned is of the opinion the evidence of illegal alien activity along I-40 in the Amarillo area as testified to by Agent Betscher is of some value when evaluating the <u>totality of the circumstances</u> of the stop of this particular vehicle, such evidence is of minimal value due

to the great deal of legitimate traffic along I-40.

## CREDIBILITY OF AGENT BETSCHER

The defendant has challenged the testimony of Agent Betscher as to exactly where the stop occurred, as to the condition of the road where Agent Betscher observed the rear of the vehicle when he determined the vehicle appeared to be heavily laden and, most critically, as to whether the agent could see inside the tinted windows of the van.

The Court assigns little value to the fact that Agent Betscher may have erred in his testimony as to the particular mile markers where the vehicular stop occurred. Assuming defendant's witness is correct, and Agent Betscher incorrect, as to the particular mile markers, there is no question Agent Betscher stopped the van in question and that it was occupied by the number of illegal aliens arrested on that date.

The conflicting testimony about the air shocks and whether the van would or would not appear to be heavily laden is more critical. This, however, appears to be one of those observations that might appear differently to different people. There is always a possibility a law enforcement agent suspecting illegal activity, whether it is alien smuggling or impaired driving due to alcohol, may scrutinize the vehicle in question and observe the vehicle differently than a non-law enforcement person. It is even possible an officer suspecting a van to be carrying illegal aliens may perceive it to be more heavily laden than it really is, and still be truthful in testifying as to his perception. It is also possible, however, that an agent with the training and experience of Agent Betscher would be able to observe a van to be heavily laden when a non-trained individual would not notice and/or distinguish such fact. It was impossible for Mr. Flowers, defendants' expert, to observe the van on the same date, from the same viewpoint, and under the

same conditions as did Agent Betscher.  The Court finds Agent Betscher's testimony that he observed the van to be heavily laden to be credible in this case.

The testimony about the tinting of the windows and the ability to see inside the van is equally as critical as the weight issue, if not more critical.  Mr. Flowers testified he could not see inside the van when he made his observations at the towing company impound lot.  Agent Betscher testified he could clearly see inside the van and that he saw two individuals sitting on the floor of the van.  There are factors which could explain or partially explain this conflict.  Whether the sun was shining directly on the windows or whether it was overcast could make a difference in one's ability to see inside the van.  Agent Betscher testified he was able to see through the bottom portions of the windows and that those portions were not tinted.  He also testified he had referred to the windows in the van as one window in his investigative report because his recollection, at the time he wrote his report, was that it was all one window.  While this conflict raises questions, the issue is that either Agent Betscher was able to see inside the van and the see the two individuals seated on the floor, or he testified falsely.  The evidence at the hearing was not so persuasive that it warrants a determination that Agent Betscher's testimony about seeing two individuals seated inside the van was untrue.  Consequently, the Court will accept Agent Betscher's testimony on this issue.

## LEGALITY OF THE STOP

The undersigned is of the opinion that determination of this case is governed by the cases of *United States v. Chavez-Villarreal*, 3 F.3d 124 (5th Cir. 1993), *United States v. Morales*, 191 F.3d 602 (5th Cir. 1999), and *United States v. Chavez-Chavez*, 205 F.3d 145 (5th Cir. 2000).  Both parties have well briefed the issues and in their post-hearing submissions, the parties

thoroughly analyzed each of these cases, and stated their positions, with supporting argument, with regard to how each case should impact the determination of this case. After considering such analysis and argument, the undersigned is of the opinion that *Chavez-Chavez* is distinguishable from the facts of the present case because, if for no other reason, the facts of that case included an agent's observation of the dirty and unkept appearance of the passengers of the vehicle which was critical under the facts of that case. That fact, considered in conjunction with the other factors identified by the *Chavez-Chavez* Court, including but not limited to, the proximity of the stop to a Border Patrol check point, render *Chavez-Chavez* distinguishable.

If *Chavez-Chavez* is, in fact, distinguishable, then the legality of the stop in this case rests upon whether this case is controlled by *Chavez-Villarreal* or *Morales*. If *Chavez-Villarreal* controls, the investigatory stop in this case was not based on reasonable suspicion and the motion to suppress should be granted. If *Morales* controls, the stop was based on reasonable suspicion and the motion to suppress should be denied.

The undersigned is of the opinion that this Court, following *United States v. Morales*, should deny the motion to suppress. The holding in *Morales* was based on factors including a determination that I-20 was notorious for alien smuggling and narcotics, that the vehicle observed by the agent appeared to be heavily loaded and the tires appeared to be under-inflated, there was a fiberglass cover over the bed of the pickup, the driver of the vehicle did a "double take" when he passed the agent's marked Border Patrol vehicle and then immediately slowed down, and the majority of smuggling activity previously detected by the agent occurred between 9:30 and 10:00 a.m., the time during which the defendant in *Morales* passed by the agent.

The facts in the present case are more similar to the facts in *Morales* than they are

*Chavez-Villarreal*. Although *Chavez-Villarreal* involved I-40 rather than I-20, both highways are heavily traveled interstate highways. The heavy amount of legitimate traffic on I-40 should not be significantly different than the amount of legitimate traffic on I-20. Unlike *Chavez-Villarreal*, the agent in this case observed a full size van, a vehicle which, based on his extensive training and seventeen years experience, he knew was routinely used for alien smuggling. The rear passenger seats of the van had been removed and he observed two individuals sitting on the floor of the van, another fact indicative of alien smuggling activity. Critically, the van appeared to be heavily laden as he followed it. No such factors were present in *Chavez-Villarreal*, but were present in *Morales.*

## CONCLUSION

In analyzing Border Patrol stops of suspected illegal aliens and in analyzing the stop as set forth above, there is one factor which cannot be ignored and which complicates the analysis of these cases considerably. That factor is the racial component. Although it is an undeniable fact that illegal immigration and illegal alien smuggling from Mexico are a major issue both regionally and nationally, it is also true that a large part of the legal population of the southwestern states is Hispanic. The facts of the instant stop of defendants would also support a Border Patrol stop of a similar van occupied by U.S. citizens of Mexican heritage. It is not unreasonable that a van, with the rear seats removed in order to allow additional storage for tools, etc., and bearing out of state license plates could be traveling down I-40 carrying U.S. citizen workers of Hispanic descent to a job site for construction work or other labor. The Constitution, however, does not guarantee that an innocent person will never be questioned or stopped by the police. Indeed, an investigatory stop effectuated pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct.1868, 20 L.Ed.2d 889 (1968), may very well reveal 100% innocent activity

which appeared to be illegal, or at least appeared suspicious enough to warrant the *Terry* stop. All the Constitution guarantees is that the investigatory stop not be unreasonable under the Fourth Amendment.

Here, giving the deference to an experienced law enforcement officer which Fifth Circuit law requires this Court to give, pursuant to *United States v. Brigham*, 382 F.3d 500 (5th Cir. 2004) (*en banc*) and *United States v. Morales*, *supra*, and based upon the articulable facts recited by Agent Betscher, including the disappearance of the passenger when the patrol vehicle pulled alongside, the removal of the seats from the passenger area of the van, the presence of two individuals sitting on the floor in the passenger area of the van, and the appearance of the van as being heavily laden, with all of the other factors, even though such factors, standing alone, would not be sufficient, under a totality of the circumstances analysis, all of these factors are sufficient to warrant a reasonable belief by a trained law enforcement officer that criminal activity was afoot. Consequently, giving such deference to Agent Betscher's extensive experience and training, and viewing the "totality of the circumstances," the stop on September 6, 2005, was lawful.

It is the opinion of the undersigned Magistrate Judge that the government has met its burden to demonstrate the stop of the vehicle was based on specific articulable facts, together with rational inferences from those facts, that reasonably warranted suspicion that the vehicle contained aliens who were illegally in the country. Consequently, it is the recommendation of the United States Magistrate Judge to the United States District Judge that the Motion to Suppress Evidence filed jointly by defendants DAVID VAZQUEZ-JOSE and MANUEL GOMEZ-LOPEZ be DENIED.

<u>INSTRUCTIONS FOR SERVICE</u>

The United States District Clerk is directed to forward a copy of this Report and Recommendation to defense counsel and to the Assistant United States Attorney by the most expedient means available.

IT IS SO RECOMMENDED.

ENTERED this <u>20th</u> day of October 2005.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

\* **<u>NOTICE OF RIGHT TO OBJECT</u>** \*

Any party may object to this Report and Recommendation.  *See* 28 U.S.C. § 636.  This case is set for docket call on Monday, October 31, 2005, and trial on Tuesday, November 1, 2005.  Therefore, all objections must be filed by **4:30 p.m. on Thursday, October 27, 2005.**  Any such objections shall be in writing and shall specifically identify the portions of the findings, conclusions, or recommendation to which objection is made, and set out fully the basis for each objection.  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on the Magistrate Judge and all other parties.  A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions set forth in this report and accepted by the district court.  *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).